**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| SpoofCard, LLC, and Amanda Pietrocola,<br><br>                                     Plaintiffs,<br><br>vs.<br><br>The Hon. Doug Burgum, Governor of the State of North Dakota, in his Official Capacity, and The Hon. Wayne Stenehjem, Attorney General of the State of North Dakota, in his Official Capacity,<br><br>                                     Defendants. | Case No. 1:19-cv-00276 |

---

**ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

**INTRODUCTION AND SUMMARY OF DECISION**

[¶1]     THIS MATTER comes before the Court on a Motion for Partial Summary Judgment filed by the Plaintiffs, SpoofCard, LLC, ("SpoofCard") and Amanda Pietrocola ("Pietrocola") , on April 17, 2020, as well as a Motion for Summary Judgment filed by the Defendant, North Dakota Attorney General Wayne Stenehjem,[1] on April 17, 2020. Doc. Nos. 17, 20. Plaintiffs filed a Response to the Defendant's Motion on May 7, 2020. Doc. No. 23. The Defendant filed a Response to Plaintiffs' Motion on May 8, 2020. Doc. No. 24. The Defendant filed a Reply on May 21, 2020. Doc. No. 25. Plaintiffs filed a Reply on May 22, 2020. Doc. No. 26.

---

[1] Defendant Doug Burgum in his official capacity as Governor of North Dakota was dismissed on January 24, 2020, by stipulation of the Parties. Doc. No. 10.

[¶2]    Having reviewed the record in this matter and for the reasons more fully stated below, the Court concludes Section 51-28-08.1 of the North Dakota Century Code violates the Commerce Clause of the United States Constitution (Art.I, § 8, cl. 3) because the North Dakota statute has an impermissible extraterritorial effect on interstate commerce. Accordingly, the Plaintiffs' Motion for Partial Summary Judgment is GRANTED and the Defendant's Motion for Summary Judgment is DENIED. Because ruling on this issue alone provides the relief requested by the Plaintiffs, the Court need not consider the remaining issues raised by the Parties.

## FACTUAL BACKGROUND

[¶3]    On April 10, 2019, North Dakota enacted its Anti-Spoofing Act, codified at Section 51-28-08.1 of the North Dakota Century Code, which became effective on August 1, 2019. S.L. 2019 (H.B. 1161), § 1, eff. Aug. 1, 2019. Section 51-28-08.1 provides in relevant part:

> (1) A person may not, in connection with any telecommunications service or internet protocol enabled voice service, knowingly cause any telephone caller identification system to:
>     a. Transmit misleading or inaccurate caller identification information with the intent to defraud or cause harm; or
>     b. Use or display a telephone number the caller does not own or has not received consent to use from the owner of the telephone number.
>
> (2) This section does not apply to:
>
> *        *        *
>
>     f. A caller who, based on the telephone number called, reasonably believes the recipient of the call is not physically within [North Dakota].

N.D.C.C. § 51-28-08.1 ("Anti-Spoofing Act") (alteration added).

[¶4]    Plaintiff SpoofCard is a company in Holmdel, New Jersey, which provides "the SpoofCard service." Doc. No. 22, p. 1. This service allows SpoofCard to facilitate calls with "the capability to change (or "spoof") the Caller ID that is displayed on a called party's telephone." Id. at p. 2. Calls may be made using the SpoofCard service from traditional landlines, mobile phones, or

computers using voice over Internet Protocol ("VoIP"). Id. at pp. 2, 8. The calls made using the SpoofCard service go through cloud computing services before being transferred to the service provider network of the recipient of the spoofed call. Id. at p. 3. During the transmission of the call, SpoofCard's infrastructure can run a check to determine if the proposed phone number is on their "do not spoof" list and the recipient is not on their Do Not Call list. Doc. Id. at p. 3. The "do not spoof" list contains phone numbers including 911, numbers of those who have asked their numbers not to be spoofed, regular and toll-free numbers of businesses, and government agencies. Id. at pp. 6-7. The SpoofCard service is used every day to make calls around the United States, including into and out of North Dakota. Id. at p. 4.

[¶5]    Plaintiff Amanda Pietrocola is the CEO and owner of SpoofCard. Id. at p. 1. She is a resident of New Jersey. Id. at p. 1.  In addition to being CEO and owner of SpoofCard, Pietrocola is also a user of her company's SpoofCard service. Id. She has made calls, and intends to make calls in the future, to or from North Dakota using the ID spoofing aspect of the SpoofCard service. Id. at pp. 1-2.

## ANALYSIS

### I.    Summary Judgment Standard

[¶6]    The Court will grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "An issue is 'genuine' if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party." Schilf v. Eli Lilly & Co., 687 F.3d 947, 948 (8th Cir. 2012) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "A fact is material if it 'might affect the outcome of the suit.'" Dick v. Dickinson State Univ., 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting Anderson, 477

U.S. at 248). Courts must afford "the nonmoving party the benefit of all reasonable inferences which may be drawn without resorting to speculation." TCF Nat'l Bank v. Mkt. Intelligence, Inc., 812 F.3d 701, 707 (8th Cir. 2016) (quoting Johnson v. Securitas Sec. Servs. USA, Inc., 769 F.3d 605, 611 (8th Cir. 2014)). "At summary judgment, the court's function is not to weigh the evidence and determine the truth of the matter itself, but to determine whether there is a genuine issue for trial." Nunn v. Noodles & Co., 674 F.3d 910, 914 (8th Cir. 2012) (citing Anderson, 477 U.S. at 249).

[¶7]    If the movant demonstrates the absence of a genuine issue of material fact, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Id.

## II.    Dormant Commerce Clause – Extraterritorial Effect on Interstate Commerce

[¶8]    Plaintiffs contend North Dakota's Anti-Spoofing Act violates the Commerce Clause of the United States Constitution because it essentially regulates commerce that occurs outside the boarders of North Dakota. The Defendant argues the Anti-Spoofing Act does not regulate commerce that occurs outside North Dakota because it expressly does not apply to "[a] caller who, based on the telephone number called, reasonably believes the recipient of the call is not physically located with the state." Doc. No. 24, p. 7.

[¶9]    Article. I, section 8, clause 3, of the United States Constitution provides, "The Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States,

and with the Indian Tribes." Under this Clause, "Congress [has] the authority to regulate interstate commerce." South Dakota Farm Bureau, Inc. v. Hazeltine, 340 F.3d 583, 592 (8th Cir. 2003). "The dormant Commerce Clause is the negative implication of the Commerce Clause," the purpose of which is to prevent states from discriminating against interstate commerce. Id. In other words, the Commerce Clause acts to "'preven[t] a State from retreating into economic isolation or jeopardizing the welfare of the Nation as a whole, as it would do if it were free to place burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear.'" Id. (alteration in original) (quoting Fulton Corp. v. Faulkner, 516 U.S. 325, 330-31 (1996)).

[¶10]   To this end, the dormant commerce clause prohibits state regulation that discriminates against interstate commerce. Jones v. Jale, 470 F.3d 1261, 1267 (8th Cir. 2006). A state regulation that discriminates against interstate commerce "is usually a per se violation of this constitutional limitation." North Dakota v. Heydinger, 825 F.3d 912, 919 (8th Cir. 2016).  A state statute may also run afoul of the dormant commerce clause "if it imposes an undue burden on interstate commerce that outweighs its local benefits." Heydinger, 825 F.3d at 819 (citing Pike v. Bruce Church, Inc., 397 U.S. 137 (1970)); see also Jones, 470 F.3d at 1267 (8th Cir. 2006) ("The dormant commerce clause prohibits states from enacting laws that '. . . unduly burden interstate commerce.'") (quoting Dakota Farm Bureau, Inc. v. Hazeltine, 340 F.3d 583, 592-93 (8th Cir. 2003)).

[¶11]   Finally, the dormant commerce clause "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." Healy v. Beer Institute, Inc., 491 U.S. 324, 336 (1989) (quotation marks omitted) (quoting Edgar v. MITE Corp., 457 U.S. 624, 642-43 (1982)). "[A] statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits

of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature." Id. The Court looks to the "practical effect" of such statutes and determines whether it "control[s] conduct beyond the boundaries of the State." Id. The Court also looks to how the statute's extraterritorial effect "may interact with legitimate regulatory regimes of other states and what effect would arise if not one, but many or every, State adopted similar legislation." Id. To that end, the Commerce Clause protects against one state's regulation bleeding into the regulatory scheme of another state. Id.  Statutes that have extraterritorial effect are "likely to be invalid per se." Heydinger, 825 F.3d at 919.

[¶12]   The Defendant argues the Anti-Spoofing Act does not violate the commerce clause because the Act exemption excludes liability for "[a] caller who, based on the telephone number called, reasonably believes the recipient of the call is not physically located within the state." N.D.C.C. § 51-28-08.1(2)(f). In other words, the Defendant argues, "to whatever extent a spoofer cannot reasonably determine she is placing a call to a recipient that is physically within the state, the Anti-Spoofing Act simply does not regulate." Doc. No. 24, p. 7. The Defendant contends the Plaintiffs can reasonably determine a call recipient is physically in North Dakota because Plaintiffs maintain a "Do Not Call" list coupled with the fact that phonebooks contain lists of phone numbers connected to a land line number in North Dakota.[2]

---

[2] The Defendant claims the physical location of a call recipient can be determined "through the triangulation of cell phone towers." Doc. No. 24, p.8, n.2. While the Court is aware that technology exists, as the article cited by the Defendant suggests, such technology is utilized by the government. Richard Miletic, Determining RF Coverage in Criminal Cases, The Gavel (Spring 2019) (found at https://view.joomag.com/spring-2019-gavel-spring-gavel-2019/0644004001557 330417?short&). A search warrant is required to obtain Cell Cite Location Information (CSLI). Id. (citing United States v. Carpenter, 138 S.Ct. 2206 (2018) (holding law enforcement officers must get a warrant before accessing historical CSLI).

[¶13]  The Plaintiffs argue North Dakota's Anti-Spoofing Act has the practical effect of regulating commerce wholly outside of its borders because it is impossible for the Plaintiffs and those who wish to use spoofing services generally to determine whether a number called is within North Dakota. Doc. Nos. 18, p. 15; 22, p. 11. Accordingly, Plaintiffs contend, the Anti-Spoofing Act is both under- and over-inclusive. Plaintiffs argue it is under-inclusive because it does not protect from illegal spoofing the numerous phone numbers in North Dakota that do not have a North Dakota area code (701). To that end, Plaintiff contend their only remedy is to cease spoofing altogether. It is over-inclusive because it would make Plaintiffs when the 701-phone number call recipient is located outside of North Dakota. Doc. No. 18, p. 18. Given the advent of call-forwarding and mobile phones, it is impossible, Plaintiffs contend, to determine where any specific phone number to be called is located. Because it is over-inclusive, Plaintiffs argue the only remedy available to them is to cease spoofing numbers with a 701-area code, which would necessarily include numerous calls that would occur without ever entering North Dakota.

[¶14]  In making their argument, Plaintiffs principally rely on TelTech Systems,Inc. v. McCollum, 2009 WL 10626585 (S.D. Fla. July 16, 2009) and TelTech Systems, Inc. v. Barbour, 866 F.Supp.2d 571 (S.D. Miss. 2011). In McCollum, Florida passed its "Caller ID Anti-Spoofing Act" ("Florida Act"), which provided in relevant part:

> (2) A person may not enter or cause to be entered false information into a telephone caller identification system with the intent to deceive, defraud, or mislead the recipient of a call.

> (3) A person may not place a call knowing that false information was entered into the telephone caller identification system with the intent to deceive, defraud, or mislead the recipient of the call.

McCollum, 2009 WL 10626585 at * 1 (quoting Fla. Stat. § 817.487). The Florida Act detailed exceptions where the Florida Act did not apply. Id. Unlike North Dakota's Act, the Florida Act

did not have a clause exempting application of the Florida Act to "A caller who, based on the telephone number called, reasonably believes the recipient of the call is not physically within [Florida]." See id.; compare N.D.C.C. § 51-28-08.1(2)(f) with Fla. Stat. 817.487(4).

[¶15]   The plaintiff in McCollum brought an action challenging the constitutionality of the Florida Act under, among other provisions, the Commerce Clause. Much like the present case, "[b]ecause of the increased use of mobile phones and call forwarding, [p]laintiffs . . . can never be certain where the parties they or their users are calling are located." McCollum, 2009 WL 10626585 at *2. The Court further found as a matter of fact, "[i]n many cases, because of increased use of mobile phone and call forwarding, it is impossible for Plaintiffs to be certain that a party they are calling is not located in Florida." Id.

[¶16]   The McCollum court found the Florida Act violated the dormant commerce clause because it regulated commerce wholly outside Florida. Id. at * 8. In reaching this conclusion, the Court reasoned:

> In this case, it is undisputed that it is impossible for Plaintiffs to know whether the recipient of their Caller ID spoofing is in Florida. Thus, Plaintiffs argue that it is impossible for them to conclude their Caller ID spoofing services anywhere in the country without risking criminal liability. For example, a business located in New York might place a call, using Caller ID spoofing services, to a telephone number with an Ohio area code. Because of call forwarding and the mobility of cellular telephones, the recipient of that call might be present in Florida, and the New York business would be criminally liable for violating Fla. Stat. § 817.487 when they called the Ohio telephone number. Plaintiffs assert that the Act makes it impossible for them to conduct their business or use Caller ID spoofing services anywhere in the country without risk of liability under this Florida statute. Accordingly, it has the practical effect of regulating commerce wholly outside of Florida, by making it impossible for Plaintiffs to use or offer Caller ID spoofing services anywhere.

Id. The McCollum court concluded, "[t]he logical consequence of this impossibility is that Plaintiffs are unable to offer Caller ID spoofing services anywhere in the country without risking

criminal liability under Florida's statute." Id. Therefore, the McCollum court held the Florida Act violated the Commerce Clause.

[¶17]   In Barbour, Mississippi passed a law that prohibited call spoofing "with the intent to deceive, defraud or mislead the recipient of a call." 866 F.Supp.2d at 572. Like the Florida Act in McCollum, the Mississippi Act did not exclude spoofed calls where the caller reasonably believed the recipient of the call not to be in Mississippi. See id. Plaintiffs in Barbour argued, as the Plaintiffs do here, the impossibility of being able to determine where a recipient of a call is located at the time a spoofed call is made has the effect of regulating commerce wholly outside of Mississippi. Id. at 576. Accordingly, the Barbour plaintiffs argued, "to ensure they do not risk criminal liability for violating the Mississippi Act, they must refrain from all caller ID spoofing." Id. Relying on McCollum, the court in Barbour concluded Mississippi's Act also violated the Commerce Clause because Mississippi's Act had the practical effect of regulating commerce outside Mississippi's borders.

[¶18]   As an alternative, however, the defendants in Barbour contended that Mississippi's statute only applied in Mississippi, therefore limiting application to calls made to Mississippi, much like North Dakota's exception for callers who reasonably believe the recipient of the spoofed call was not in North Dakota. Id. at 577. To that end, the Barbour defendants argued the Mississippi Act "does not attempt to 'directly control' commerce that occurs 'wholly outside' the state." Id. The Barbour court concluded, however, that whether the statute intends to directly control extraterritorial commerce is not controlling. Id. Instead, the court asked "whether [the Mississippi Act] has 'the "practical effect" of regulating commerce occurring wholly outside that State's borders.'" Id. (quoting Healy, 491 U.S. at 332). Because the Mississippi Act had "a significant extraterritorial effect," the court held it violated the Commerce Clause. Id.

[¶19]   This case is similar to both <u>McCollum</u> and <u>Barbour</u> because, even under North Dakota's Anti-Spoofing Act, it is impossible for the Plaintiffs to determine where the recipient of the potential spoofed call is physically located. The North Dakota Act has an exception to the Anti-Spoofing Act's applicability for those callers who reasonably believe, based on the number called, that the individual called is not physically within North Dakota. Plaintiffs correctly maintain determining the location of a spoofed call recipient is impossible due to call forwarding and portability of phone numbers.[3] <u>See</u> Doc. No. 22, p. 9. Calls to a landline can be forwarded to a mobile phone located anywhere in the United States. Mobile phones also pose a problem. A North Dakota resident may move to another state and bring their mobile phone with a 701-area code with them to their new state of residence. <u>See id.</u> As such, at any given moment, it is impossible for the Plaintiffs to determine whether a 701-phone number is actually in North Dakota.

[¶20]   The Defendant attempts to distinguish this case from <u>McCollum</u> and <u>Barbour</u> arguing (1) the statutes in those cases did not have the same exception as North Dakotas does and (2) the Defendant here contests the claim that it is impossible for the Plaintiffs to determine reasonably the location of the call recipient. The Defendant's claim the exclusion North Dakota's Anti-Spoofing Act remedies the constitutional problems with the Act are unavailing. As discussed above, it is impossible for the Plaintiffs to determine where the individual called is physically located at any given moment. Due to this impossibility, it cannot be reasonable for the Plaintiffs to determine whether a person called is or is not physically within North Dakota. In other words, reasonability and impossibility under the circumstances here are mutually exclusive. The person who receives the call can be anywhere in the United States due to call-forwarding, mobile phones,

---

[3] "Porting" a phone number allows individuals to keep their phone number when going from one carrier to another. <u>Barbour</u>, 866 F.Supp.2d at 575-76 (mobile number portability "permits a mobile customer which switches carriers to keep his existing phone number"); Doc. No. 22, p. 9.

and the portability of phone numbers. As such, the Court concludes it is impossible for the Plaintiffs to reasonably know whether the caller is or is not physically in North Dakota.

[¶21]   Because it is impossible for Plaintiffs to determine whether any given number is physically within North Dakota at the time the call is made, the Anti-Spoofing Act unconstitutionally violates the dormant commerce clause. Before making any call to a 701-area code number, regardless of whether the call recipient is physically in North Dakota, Plaintiffs will be forced to conduct their business in a certain way to determine, if even possible, the location of the person called or, more likely, cease calling 701 phone numbers altogether. See Doc. No. 22, p. 11-12. By ceasing to call 701 numbers, SpoofCard will essentially be forced to stop engaging in interstate business or face civil or criminal liability because the exemption to the Act specifically states the reasonableness of determining the location of the person called is based on the number called.[4] If that is the case, then Plaintiffs could be criminally or civilly liable for calls made to a 701 number when the recipient of the call is in any other state in the United States.

[¶22]   If, however, as the parties suggest, the exemption is interpreted to put an affirmative duty on the caller to determine the recipient's physical location by generally using reasonable means, then the Plaintiffs out-of-state commerce is still directly controlled by North Dakota's Anti-Spoofing Act. Under this interpretation, Plaintiffs would be required to engage in an inquiry to determine the location of the recipient of the call regardless of area code. As such, every single call that goes through SpoofCard, SpoofCard would initially have to make a reasonable determination whether the recipient of any call is in North Dakota. See Doc. No. 22, p. 13. This would effectively regulate SpoofCard's interstate business with calls made to every state in the

---

[4] Section 51-28-08.1(2)(f) of the North Dakota Century Code provides: "A caller who, **based on the telephone number called**, reasonably believes the recipient of the call is not physically within [North Dakota]." (emphasis and alteration added).

United States. See Heydinger, 825 F.3d at 919 ("The critical inquiry is whether the practical effect of the regulation is to **control conduct** beyond the boundaries of the States." (quoting Healy, 491 U.S. at 336 (quotation marks omitted) (emphasis added)).

[¶23]   This places businesses like SpoofCard in a predicament. They either conduct their business for all calls (not just those to North Dakota area code numbers) to comply with North Dakota's regulation or they cease spoofing altogether. Either way, these two scenarios are simply not permissible under the Commerce Clause. See id.; McCollum, 2009 WL 10626585 at * 8; Barbour, 866 F.Supp.2d at 575-77.  North Dakota's Anti-Spoofing Act, under the parties' interpretation of the Act's exemption, has extraterritorial effect on interstate commerce. Much like in McCollum, the logical consequence of the Plaintiffs' impossibility of determining the location of the call recipient is that they will have to cease spoofing altogether. See McCollum, 2009 WL 10626585 at *8. This is simply not tolerated by the Commerce Clause. See id.

[¶24]   The Defendant also argues this case differs from McCollum and Barbour because he contests whether it is impossible for Plaintiffs to determine reasonably the location of the call recipient. The Defendant contends that because SpoofCard maintains a "Do Not Call" list coupled with the fact that there are phonebooks that attach phone numbers to a physical location. Accordingly, the Defendant argues, SpoofCard can determine the location of some call recipients. The Court is unpersuaded.

[¶25]   While these may be avenues to attempt to determine the physical location of a call recipient, call forwarding renders the phonebook as a source of location irrelevant. At any given time, the recipient of a spoofed call to any given number in a phone book may be in any state, not just North Dakota. This is because calls are easily forwarded to mobile phones, which individuals regularly take with them while traveling outside of North Dakota. See Barbour, 866 F.Supp.2d at 575 ("Due

to the tremendous growth of mobile phone usage and the fact that many cell customers have mobile numbers that are associated with an area code other than the one where they live . . . ."); Doc. No. 22, pp. 10-11.

[¶26]   Finally, the Defendant claims that every instance of regulation under the Anti-Spoofing Act must have an unconstitutional effect on interstate commerce, citing Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 (2008). This argument is perhaps a sophisticated variation of the argument that North Dakota's Anti-Spoofing Act does not attempt to directly control in every instance extraterritorial commerce. See Barbour, 866 F.Supp.2d at 577 ("Defendants submit, alternatively, that even if viable in this circuit, the extraterritoriality principle has no potential applicability here since Mississippi's statute applies only in Mississippi and does not attempt to 'directly control' commerce that occurs 'wholly outside' the state.").

[¶27]   Under the extraterritoriality doctrine, however, the Plaintiffs must show the Anti-Spoofing Act has the "practical effect" of regulating commerce "wholly outside" of North Dakota, "whether or not the commerce has effects within the State." See Healy, 491 U.S. at 336. Because the Plaintiffs have shown it is impossible for them to determine the location of the recipient of the spoofed call, they are exposed to criminal and civil liability in North Dakota for calls made to individuals outside North Dakota's borders. This is because the Plaintiffs must either conduct all of their business in a certain way to avoid liability in North Dakota or, more likely, cease spoofing altogether.  Accordingly, the Court concludes the Anti-Spoofing Act effectively regulates how Plaintiffs engage in their interstate commerce.

## CONCLUSION

[¶28]   North Dakota's Anti-Spoofing Act has the practical effect of regulating interstate commerce because it is impossible for Plaintiffs to determine whether a call recipient is physically

within North Dakota. Section 51-28-08.1 of the North Dakota Century Code, therefore, violates

Article. I, section 8, clause 3, of the United States Constitution. The Plaintiffs' Motion for Partial

Summary Judgment is **GRANTED**. Defendant's Motion for Summary Judgment is **DENIED**.

Enforcement of Section 51-28-08.1 of the North Dakota Century Code is therefore **ENJOINED**.

Because the Court concludes North Dakota's Anti-Spoofing Act violates the Commerce Clause,

considering the remaining arguments raised by the parties is unnecessary.

[¶29]   **LET JUDGMENT BE ENTERED ACCORDINGLY**.

[¶30]   **IT IS SO ORDERED.**

DATED November 9, 2020.

Daniel M. Traynor, District Judge
United States District Court